WICKER, J.,
CONCURS WITH REASONS
|¾71 agree fully with thé analysis and the outcome in this matter. There is no evidence in the record that Mr. Mouton made any attempt to fulfill the registration requirements the law obligated him to fulfill. Moreover, there is overwhelming evidence in the record—including over a hundred pages of sexually explicit drawings and journal entries, both illustrating what Mr. Mouton wished to do to children of various ages—that Mr. Mouton is a child sexual predator at an extraordinarily high risk of re-offending. However, I write separately to highlight the constitutional, the public safety, and the economic problems posed when, as happens all too often, indigent sex offenders are released to homelessness. ,
As outlined in the Court’s opinion, La. R.S. 15:542 contains stringent registration requirements. The statute requires payment of a $60 annual fee in order to register. The offender is mandated to register within three business days of release from incarceration. It is rare that the offender is released with more than the price of a bus ticket and twenty dollars. Additionally, in order to satisfy notification requirements, an offender registering in Jefferson or Orleans parishes must pay $193.50 to place an advertisement in the newspaper and must spend between $100 and $1000 on notification postcards to individuals living within thrée-tenths of a mile of his residence if he lives in an urban or suburban | ¡^area. La. R.S. 15:542.1(A)(l)(a). The offender must do all of this within twenty-one days of his release. La. R.S. 15:542.1(A)(2). While the registration statute, La. R.S. 15:542, contains language that suggests the $60 registration fee is potentially waivable, see La. R.S. 15:542(D), the notification statute, La. R.S. 15:542.1 is silent in this regard. Unless an offender has independent means—such as help from a family member^—or has a job waiting for him upon release, these financial burdens imposed practically immediately upon release are impossible to bear.
. The registration statute also requires an individual, like Mr. Mouton, who has spent most of the last twenty-five years in prison and who apparently has no family, to present himself at the parish of his residence with two forms of proof of residence. La. R.S. 15:542(C)(1)(e). Mr. Mouton indisputably. has no residence. The statute, alternatively, requires Mr. Mouton to “provide an affidavit of an adult resident at the same address,” certifying “that the affiant understands his obligation to provide written notice pursuant to La., R.S. 15:542.1.4 to the appropriate law enforcement agency with whom the offender last registered when the offender no longer resides at the residence provided in the affidavit.” La. R.S. 15:542. Again, if Mr. Mouton does not have a residence and has no family, how precisely can he meet this requirement with no social or financial resources in three days? See La. R.S. 15:542(0(2).
Moreover, pursuant to La. ■ R.S. 15:542(J), the offender must also provide law enforcement a copy of his driver’s license and identification card. While it appears that DOC is making efforts to help offenders obtain state-issued ID prior to leaving prison, Mr. Mouton’s case demonstrates that such help does not reach every offender. In three days’ time, the law requires offenders like Mr. Mouton, who was released with a bus ticket and about $20 in funds, to obtain a driver’s ^license or state-issued identification card in order to register. Leaving aside the *1262 problem of transportation, according to the Louisiana Office of Motor Vehicles, the current cost to obtain a state-issued identification card is between $18 and $24, and the current cost to obtain a driver’s license is between $32.25 and $38.25. There was vague testimony at trial that the Jefferson Parish Sheriffs Office would have helped Mr. Mouton obtain an ID if he asked for help, but the law does not provide free IDs to sex offenders. See La. R.S. 40:1321(H) (provision which permits' residents of the state who are 60 years or older to obtain a special identification card free of charge expressly does not apply to sex offenders). Without help from family members or friends, a benefit far too many sex offenders do not enjoy, there is ho conceivable way in which a person released to homelessness with $20 to his name can meet this requirement in three days.
Moreover, pursuant to La. R.S. 40:Í321(J) and La. R.S. 32:412(1), any li-censé or identification card issued to a sex offender must be renewed every year, and La. R.S. 32:412(I)(4) makes clear that “the regular renewal fee shall be collected at each renewal.” Thus, along with the 'other fees for which the indigent offender is responsible, he must also obtain the funds annually for a new identification card in order to keep his registration current. For an indigent offender, these requirements are effectively impossible to fulfill, yet the failure, to .satisfy these registration requirements exposes the offender to an additional conviction and imprisonment for violating La. R.S. 15:542. It becomes an endless cycle of arrest, release, re-arrest, and new conviction. With any subsequent felony conviction, even .if that felony is not a sex offense, the period of time during which defendant must register begins anew. La. R.S. 15:544.2.
| apThe Fourteenth Amendment of the United States Constitution restricts a state’s capacity to punish with imprisonment an indigent person who has made bona fide attempts to pay a fine imposed. See Bearden v. Georgia, 461 U.S. 660, 672, 103 S.Ct. 2064, 2073, 76 L.Ed.2d 221 (1983). The Bearden Court determined that, if a probationer could not pay a fine despite sufficient bona fide efforts to acquire the resources to do so, the trial court must consider alternative measures of punishment other than imprisonment. Id. Only if alternative measures are not adequate to meet a state’s interests in punishment and deterrence may the court imprison a probationer who has made sufficient bona fide efforts to pay. Id.
The Louisiana Supreme Court recently applied Bearden to a case involving a sex offender who filed a motion to quash an indictment for failure to register under La. R.S. 15:542. State v. Jones, 16-0017 (La. 1/13/17), 206 So.3d 871 (per curiam); see also State v. Jones, 15-500 (La.App. 5 Cir. 12/23/15), 182 So.3d 1218. The defendant entered a guilty plea pursuant to State v. Crosby, 338 So.2d 584 (La. 1976), wherein he reserved his right to appeal the trial court’s ruling on his motion to quash. This Court affirmed the defendant’s conviction. In a brief per curiam opinion, the Louisiana Supreme Court subsequently granted the defendant’s writ application in part, ordering the district court to reconsider its ruling denying the defendant’s motion to quash in light of Bearden and to permit the defendant' to withdraw his guilty plea if he is determined to be indigent and entitled to relief under Bearden.
Although it is undisputed in this case that Mr. Mouton made no efforts to comply s with registration requirements set forth in La. R.S. 15:5¾2, the fact remains that the requirements themselves are impossible for an indigent, offender to fulfill, and this fact could have serious constitutional implications in a case, |STsuch as Jones, involving a defendant who does *1263 make bona fide efforts to comply but cannot because of his indigency.
Paradoxically, the stringency of these registration requirements also implicates public safety concerns. The impossibility of fulfilling registration requirements may deter some indigent sex offenders from ■even attempting to fulfill the requirements. As a result, members of the public—whom these registration, and notification laws aim to.protect—are subjected to the legitimate danger of having some of the most serious sexual offenders living unsupervised and unaccounted for on the streets. DOC will not release an inmate without an approved residence plan, unless he has completed the full term of his sentence and legally .cannot be held any longer. Currently, DOC is continuing to incarcerate four hundred thirty-nine sex offenders who are eligible for release but who do not have an approved residence plan. Even if an offender is fortunate enough to have a family member who is willing to support him, oftentimes DOC cannot release the offender to his family’s care because the proposed residence is, for instance, too close to a school or a daycare facility. Thus, the offenders who are most at risk—that is, those without family ties and without any place to go—are the ones who, inevitably, are released to the streets after having served their entire sentence.
This.is a difficult issue, but it is not one that is impossible to tackle. Several of our sister states. have undertaken promising efforts to address this problem head-on.
Recognizing that one of the biggest Obstacles to recidivism for sex offenders is the absence of family and social ties, several states have begun to implement a program called Circles of Accountability and Trust (“COSA”). North Carolina is the first Southern state to implement this program, which was | aboriginally developed in Canada. Currently, Durham County operates the only COSA program in the state, but it has enjoyed enormous success in its five years of existence. COSA Durham, which is funded by a public-private partnership bétween Durham County and the Religious Coalition for a Nonviolent Durham, received its initial grant from the United States Department of Justice’s Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking (“SMART”).[4] The program aims to help sex offenders with the highest risk of re-offending, and it has raised money for sex offender housing for those who need it through Durham County and through local faith organizations.
. The program’s organizer does an individualized risk-assessment to identify those offenders who have the highest risk of re-offending, who are about to released *1264 from prison, and who are eligible to participate in the program. The program only accepts offenders who (1) committed a sex offense in Durham County, (2) had a permanent residence in Durham County prior to incarceration, or (3) have a family member residing in Durham County who is willing to sign an affidavit agreeing to support the offender throughout his reentry back into the community and participation in the program. After the program’s organizer meets with an offender in prison and determines what his needs are, including his housing needs, community volunteers begin meeting with the offender—-who is called a “partner”—between two and four months prior to his release. These four to five volunteers form what is called a “circle” with the partner. They Issbecome his friend, and they hold him accountable. Volunteers meet with the partner once a week and talk with him daily, for at least' a year but usually about eighteen months. As the partner progresses in his recovery, the circle transitions to meeting with the partner once a month. The organization spends both time and money working with the partner to connect him with job training and employment services to help him find a job. In the program’s five year history, it has experienced remarkable success. The program has worked with roughly twenty offenders, all of whom were identified as those most likely to commit another sex offense. Thus far, not a single Durham Count COSA partner has committed another sexual offense.
Like Louisiana’s DOC, Utah’s Department of Corrections will not release a sex offender to homelessness. Utah’s sex offenders, however, are not thrust back into the community .without supervision and without any resources. Through its Adult Probation and Parole Services which is funded by the state’s Department of Corrections, Utah has established five “community correctional centers”—two for housing women and three for housing men. Two of these five centers house sex offenders. The Utah Board of Pardons and Parole will often order a sex offender to transfer to a community correctional center for “stabilization” prior to his release to help facilitate his reentry into society. Por a sex offender, stabilization includes treatment, employment, and the accumulation of some savings, depending on the offender’s circumstances. It is mandated that, once the offender begins to work, he must submit his paycheck to the community correctional center to help facilitate savings. Nevertheless, the center permits the offender to make draws on his paycheck every week. For sex offenders, these community correctional centers provide both housing, rehabilitation, and an opportunity to ease back into the demands of ordinary life.
| ^Although these community correctional centers require resident sex offenders to save the money they earn, the released sex offender can actually dedicate these funds to his reentry. Therefore, the notification and the registration requfrements are much more feasible for him to meet. In order to register, an offender must only pay a one-time fee of $100. Every six months, the offender must update his registration. There is no requirement that the offender pay several hundred dollars to publish an advertisement in the newspaper and to send postcards to his neighbors. The community receives notification through Utah’s sex offender registration website, which allows any citizen to request that an e-mail alert be sent to him anytime an offender moves into his neighborhood.
Interestingly, Louisiana’s Offender Watch website is similarly equipped with a function that allows a citizen to not only request e-mail alerts but also to have those e-mail alerts tailored to whatever radius *1265 around his home the citizen chooses. Given that our state already has this capability, an amendment of La. R.S. 15:542.1(A)(2) to eliminate the newspaper advertisement and the snail mail notification requirement could go a long way to reducing the financial burden on sex offenders reentering the community and the increasing financial burden our state bears to incarcerate offenders for failing to register. The PEW Charitable Trust recently conducted a data analysis for the Louisiana Justice Reinvestment Task Force to measure incarceration trends in our state. Sex offender registration violation was one of the top ten offenses at admission for newly sentenced prisoners, and the study showed that the number of prison admissions for this offense increased by 253% between 2006 and 2015. Moreover, PEW found that the months served in prison for sex offender registration violations has increased by 338% between 2006 and 2015. "When one considers that the average daily cost of incarcerating an individual in Louisiana is $24.39, not 1 ¡^mention the administrative costs associated with prosecution, the issue takes on a serious economic dimension. With the increased use of e-mail and the decreased circulation of newspapers, at some point long ago, the marginal cost of providing snail mail and newspaper community notification began to far outweigh the marginal benefits associated with this type of additional notification.
Texas, similarly, will not release a sex offender to homelessness. The Texas Department of Criminal Justice through its Parole Division has established five halfway houses for parolees, including sex offenders, who need close supervision or who lack community support at the time of their release. These facilities provide job assistance and require offenders to participate in a savings program. Last year, the average cost of the halfway house per day per participant was $42.26, which is roughly an average of $20 per day less than it costs to incarcerate a prisoner in Texas. Additionally, the offender pays 25 percent of his or her gross monthly income to further reduce the state’s costs.
Although the Louisiana state budget has limited resources, there are solutions available. With limited resources, DOC seems to be doing its best to address this serious problem, but it can only do so much. The law as it is currently written sets sex offenders up for failure by pretending that they have the independent financial wherewithal to meet registration requirements within days after their release from prison or have a supportive social community network to help them finance the fees for registration and notification and to assist them in their reentry into society. Perpetuating such fantasies will not solve these difficult problems. These requirements are practically impossible for offenders to meet and economically unsound for the state’s budget. I strongly encourage the Legislature to take a hard look at this serious public safety issue.

. SMART recently published a report evaluating various sex offender management strategies implemented across the United States. See Christopher Lobanov-Rostovsky, Sac Offender Management Strategies, available at https://www.smart.gov/SOMAPI/secl/ch8- . strategies.html (last visited Apr. 7, 2017). The SMART report encouraged the use of the COSA model, highlighting two studies from Canada comparing the recidivism for COSA groups of high-risk sex offenders and non-COSA groups of high-risk sex offenders. One study found a 5 percent sexual recidivism rate for the COSA group and a 16.7 percent recidivism rate for the non-COSA group over a 4:5 year follow up period, which researchers determined was a statistically significant reduction in sexual recidivism. Robin J. Wilson, Janice E. Picheca & Michelle Prinzo, Circles of Support and Accountability; An Evaluation of the Pilot Project in South-Centrql Ontario, http://www.csc-scc.gc.ca/researcb/092/rl68_e, pdf (last visited Apr. 7, 2017). The second study, using a 35-month follow up period found that 2.3 percent of the COSA group sexually recidivated while 13,7.percent of the non-COSA group recidivated. Robin J. Wilson, Andrew McWhinnie & Franca Cortoni, Circles of Support & Accountability: A Canadian National Replication of Outcome Findings, 21 Sexual Abuse: A Journal of Research and Treatment412-30 (2009),